IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CV-119-FL

| | |
|---|---|
| TAMU ARTIS, *for A.M., a minor*, ) <br> ) <br> Plaintiff/Claimant, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | **MEMORANDUM AND RECOMMENDATION** |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-20, -22] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. This action was filed by Tamu Artis ("Plaintiff") on behalf of A.M., her minor son, ("Claimant") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the denial of his application for Supplemental Security Income ("SSI") payments. Plaintiff filed a response in opposition to Defendant's motion [DE-25], and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Plaintiff's Motion for Judgment on the Pleadings be allowed, Defendant's Motion for Judgment on the Pleadings be denied, and the matter be remanded for further proceedings.

**I. STATEMENT OF THE CASE**

On April 1, 2011, Plaintiff protectively filed on Claimant's behalf an application for SSI, alleging disability since July 18, 2007. (R. 9, 137-46). The claim was denied initially and upon reconsideration. (R. 9, 78-98). A hearing before an Administrative Law Judge ("ALJ") was held on March 4, 2013 (R. 32-77), and on August 9, 2013, the ALJ issued a decision denying Claimant's

request for benefits (R. 6-31). On September 9, 2014, the Appeals Council denied a request for review of the ALJ's decision. (R. 1-4). A complaint was then filed on behalf of Claimant in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

Under the Act, a claimant under the age of 18 is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Social Security regulations provide a three-step sequential evaluation process for determining whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. *Id.* § 416.924(a), (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe"; if not, the claimant is not disabled. *Id.* § 416.924(a), (c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. *Id.* § 416.924(c). If the claimant has a severe impairment, the analysis progresses to step three where the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. *Id.* § 416.924(a), (d). If the claimant has such an impairment, and it meets the duration requirement, the claimant is disabled. *Id.*

In this case, Plaintiff contends (1) the ALJ erred in finding that Claimant demonstrated less than marked limitation in the domain of acquiring and using information; and (2) the ALJ failed to provide a full and fair hearing. Pl.'s Mem. [DE-21] at 11-21; Pl.'s Resp. [DE-25] at 1-8.

3

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since the application date. (R. 12). Next, the ALJ determined Claimant had the following severe impairments: mixed receptive-expressive language disorder, oppositional-defiant disorder, and attention deficit hyperactivity disorder ("ADHD"). (R. 12-14). However, at step three, the ALJ concluded these impairments, individually or in combination, do not meet, medically equal, or functionally equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-25).

### B. Tamu Artis's Testimony at the Administrative Hearing

Claimant's mother, Tamu Artis, testified at the administrative hearing. (R. 33-62). Plaintiff was not represented by counsel at the hearing, and the ALJ explained the right to representation to Plaintiff and offered to continue the hearing to afford her an opportunity to retain counsel, which she declined. (R. 35-41). Plaintiff failed to bring Claimant to the hearing, despite having received a notice to do so, and the ALJ explained that she would like to see Claimant and would schedule a supplemental hearing for that limited purpose if necessary after reviewing the other evidence. (R. 35, 38-41, 75). Plaintiff submitted additional evidence to the ALJ, which was incorporated into the record, and the ALJ asked Plaintiff to submit additional treatment and school records not in evidence. (R. 41-44, 73-75).

The ALJ first asked Plaintiff how receiving SSI payments would help address Claimant's functional problems and Plaintiff's situation. (R. 45). Plaintiff responded that Claimant has

4

difficulty comprehending, interpreting, and explaining his thoughts and needs additional help that she cannot afford and Medicaid does not cover. (R. 45-46, 61). Plaintiff receives $87 weekly in child support for three of her five children (ages 21, 18, 8, and 5 year-old twins), receives $1,000 in food stamps, and works part-time as a receptionist at a hotel. (R. 51, 61). Claimant's father does not live in the home. *Id.* Claimant was close to his father, but since his father moved to Atlanta more than two years ago, Claimant had only seen him once. (R. 52). Claimant's father calls daily but only talks to Claimant about once a week because Claimant does not like talking to him, which Plaintiff attributes to Claimant being afraid his father will "get on him" about his bad behavior. *Id.* Claimant's father encourages him to behave better. (R. 53).

Plaintiff testified that Claimant was eight years old at the time of the hearing and in the second grade. (R. 46-47). Claimant makes below average grades, 1's and 2's, and is performing below grade level. (R. 47). Plaintiff indicated she thought the ALJ already had Claimant's report cards, but the ALJ stated the record contained only 2011 information and Plaintiff should provide a copy of Claimant's current grades. *Id.* Plaintiff testified that Claimant has ADHD, a mixed receptive language disorder, and oppositional defiant disorder. (R. 48). The ALJ explained that "bad behavior does not make a disability by itself... [u]nless it arises from some other reason." *Id.* Plaintiff responded that Claimant's behavioral problems arise from his frustration with his inability to express himself, that he has difficulty speaking in a complete sentence and comprehending, and resultantly he has trouble with his peers at school. *Id.* Claimant is picked on frequently at school, is becoming more aggressive, hitting other children, was kicked off the bus a month before the hearing, and has had several referrals sent home. (R. 48, 53). Plaintiff attributes these behaviors to Claimant's language disorder, explaining that he talks as if he is in kindergarten, his five-year-old

5

twin sisters speak better than him, and this bothers him. (R. 48).

Claimant can understand what is said to him so long as it is not too extensive. (R. 49). For example, if Claimant is read a story from a book, he cannot explain what the story is about. *Id.* Plaintiff explained Claimant's problems are worsening, particularly since he started second grade in August 2012. (R. 49-50, 53). Plaintiff met with Claimant's teachers and principal and they explained to her that Claimant is exhibiting similar characteristics of children with autism. (R. 53). Claimant was evaluated by his pediatrician for autism, referred to UNC and the Haymount Institute for further evaluation for autism, and placed on a list to be evaluated for autism at school. (R. 53-54). Claimant receives speech therapy in school for one hour a day, three days a week, and is otherwise in regular classes. (R. 59). Plaintiff believes Claimant is just being passed along and is not understanding as well as the other children in his class so he is falling behind. (R. 60).

Plaintiff has trouble with Claimant at home, where he is very brutal and aggressive with his twin sisters, hitting them and instigating things between them, and Claimant slams doors and kicks walls. (R. 50). Plaintiff had started giving Claimant chores, such as cleaning his room, making his bed, and sweeping, but Claimant is unhappy about it and does not always do his chores. (R. 51, 55). Claimant likes to play video games, which helps to calm him down, and likes to build forts in the house. (R. 58-59). Claimant also likes playing basketball, but does not have many friends to play with, as there are no children his age on their street and he has trouble getting along with other students at school. (R. 55). Plaintiff takes Claimant to the park where he sometimes sees children he knows from school. (R. 56). He plays well with them at times but at other times he is too aggressive. *Id.* Plaintiff also takes Claimant to church sometimes and he does okay, becoming fidgety at times when sitting with her through the service. (R. 57). Claimant takes Adderall and

6

Intuniv, which has helped with his hyperactivity, but not with his language. (R. 57-58). The medications cause some appetite and sleep disturbance. (R. 58).

### C.     Testimony of Suzanne Bowman

Suzanne Bowman, Claimant's behavioral therapist with Premier Behavioral Incorporated, testified at the administrative hearing. (R. 63-77). She is a licensed therapist with almost ten years of experience working with children. (R. 63). Bowman had been working with Claimant for just over a year, beginning in February 2012, but the ALJ only had records from March 22, 2012 through May 21, 2012 and requested that Plaintiff either provide the rest of the records or sign a release so the records could be obtained. (R. 64-65). Plaintiff sought treatment with Bowman's agency for Claimant, because she believed Claimant was not receiving adequate services from another agency. (R. 65-66).

Bowman sees Claimant every two weeks and has two other team members who see Claimant weekly. (R. 67). Claimant is also seen by a doctor at the agency who prescribes Adderall. (R. 66-67). Bowman provides intensive in-home counseling, targeting not only Claimant's behavior but also other goals parallel with his diagnoses, mixed expressive language disorder, adjustment disorder with disturbance of conduct, and ADHD. *Id.* Intensive in-home counseling has a therapeutic component that includes the parent, child, and counselor, and Bowman first tries to understand from Plaintiff what has been going on since the last visit and then she tries to offer an intervention that deals with one of Claimant's goals. (R. 67). For example, if hypothetically Plaintiff says Claimant has been having some extreme issues with behavior at school or fighting his siblings, i.e., aggression, Bowman would offer an intervention that would try to help Claimant understand why that is not a good way to communicate. (R. 67-68). Bowman also interacts with Claimant on ways to help him

7

communicate more effectively. (R. 68). She tries to balance out the speech therapy Claimant receives in school by helping him with his aggression and providing other ways to help Claimant communicate, because she believes his aggression is an effect of Claimant's diagnosis—in other words, Claimant acts out because he cannot communicate. (R. 69).

Bowman explained that you can speak to Claimant and think he is taking in the information so that he can compute it and then relay back his answer, but for the most part he cannot. (R. 70). She described it as "almost like turning on and off a light switch"; some days when she works with Claimant he seems to understand what she is saying and can give a pretty good response, but other days he will sit and look at her for 30 seconds and despite prompting does not seem to understand and will respond with information that is completely unrelated to what she asked him. *Id.* For example, when Bowman first started working with Claimant, she used an exercise dealing with emotion, showed Claimant a sad bear face, and asked him if he had ever felt sad and what that meant. (R. 71). She showed Claimant the sad mouth and he mimicked it, and then sat there and looked at her, so she asked him again, and then about 15 or 20 seconds later he responded with his routine school schedule—"I get on the bus, I go to class, I eat breakfast," etc.—for the entire day, which had nothing to do with what she asked him. *Id.* When she attempted to redirect him back to what she was working on with him and ask him again, he sat there and then said, "[b]ut I'm not angry." *Id.* Bowman said the exercise "completely went over his head." *Id.* The ALJ suggested that "maybe if he's not angry he doesn't understand why you're asking him if he's angry or unhappy or anything," acknowledging that it was still a comprehension issue, but that it might be that they were "communicating different things." *Id.* Bowman indicated she did not know if she would look at it that way and then provided the following example to further explain:

8

> [I]f I would ask you a question . . . like "Is the light on in this room?" . . . And then you look at me for 20 seconds and don't respon[d]. . . . And then I say, "look at the light. Is it on or off?" . . . And you say, "Is it time to go home?" I mean, that's basically how it works. Then there might be a day that I come in there and I say, "Well, is the light on in this room or is it off?" . . . "If we look at the light, is it bright or is it dark?" And then he may say, "It's on." But it's never consistent. . . .There's always seemingly a gap in there.

(R. 71-72). Bowman believes the services Claimant receives have helped him considerably but that there are still obvious deficits, and Claimant needs additional services beyond what she can provide because his diagnosis has to do not only with speech but also with comprehension. (R. 68-69, 73).

## V. DISCUSSION

### A. Acquiring and Using Information

Plaintiff contends the ALJ's finding that Claimant has a less than marked limitation in the domain of acquiring and using information is not supported by substantial evidence. Pl.'s Mem. [DE-21] at 11-18; Pl.'s Resp. [DE-25] at 2-6. Defendant contends the ALJ's finding in this regard is supported by substantial evidence. Def.'s Mem. [DE-23] at 12-17.

If a minor's impairments do not meet or medically equal a listing, the ALJ must determine whether there is functional equivalency. 20 C.F.R. § 416.926a(a). In making this determination, the ALJ considers how a claimant functions in terms of six "domains," which are "broad areas of functioning intended to capture all of what a child can and cannot do." *Id.* § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) self-care; and (6) health and physical well-being. *Id.* § 416.926a(b)(1)(i)-(vi). A finding of functional equivalence requires either "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(d). A "marked" limitation is defined, in relevant part, as follows:

9

your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

*Id.* § 416.926a(e)(2)(i). The domain of acquiring and using information considers how well a claimant acquires or learns information and how well the information learned is used. *Id.* § 416.926a(g). Examples of some of the limitations considered in assessing this domain include a failure to "demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night" or to "rhyme words or the sounds in words," "difficulty recalling important things you learned in school yesterday," "difficulty solving mathematics questions or computing arithmetic answers," and "talk[ing] only in short, simple sentences and hav[ing] difficulty explaining what you mean." *Id.* § 416.926a(g)(3).

The ALJ found Claimant has a marked limitation in the domain of interacting and relating with others but no limitation or less than marked limitation in all other domains. (R. 19-25). With respect to the domain of acquiring and using information, the ALJ concluded that Claimant has less than marked limitation, explaining his decision as follows:

> The child's kindergarten teacher reported no problems in this domain between August 2010 and May 2011 (Exhibit 5E: 8). Dr. Frazier noted the child['s] verbal, performance and full-scale IQ scores were in the borderline to low average range, but the child was "probably functioning within low normal limits, secondary to a short attention span" (Exhibit 3F: 4).
>
> However, in November 2011, his first-grade teacher checked boxes indicating "very serious" problems with reading and comprehending written material, expressing ideas in written form and applying problem-solving skills in class discussions. She also indicated a "serious" problem with providing organized oral explanations, and "obvious" problems in nearly all other activities in this domain. On the other hand,

10

> her only written comment was that the child had a problem trying to express and retell verbal information; that he used short, "chopped" expressions–which is consistent with the child's expressive language disorder (Exhibit 9E: 2).
>
> The only grade report available, dated December 20, 2010, reflects the child earned "4" in mathematics and "3's" in all other subjects (Exhibit 10E: 3). He was promoted to the next grade. The grade card also showed that the claimant had six tardies and 14 absences during the school year, a factor that negatively impacts any child's ability to acquire and use information but is not related to a disabling medical impairment.

(R. 20). In making this determination the ALJ expressly considered the age categories for an older infant or toddler (age 1 to attainment of age 3) and a preschooler (age 3 to attainment of age 6). (R. 19.) In the ALJ's decision, it states that Claimant was "an older infant on April 1, 2011, the date [the] application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2))." (R. 12). However, Claimant was 5 years old (a preschooler) on the date the application was filed, and Claimant was 8 years old and in the second grade (R. 46-47), which is classified as a school-age child (age 6 to attainment of age 12), at the time of the administrative hearing. 20 C.F.R. § 416.926a(g)(2)(iii), (iv). Thus, the ALJ failed to consider the appropriate age category, that of a school-age child, which applied for the majority of the applicable period. *See* Def.'s Mem. [DE-23] at 14 ("At all times relevant to the ALJ's decision in this case, Claimant was a school-age child, between the ages of six and twelve.") (citation omitted); *Trammell v. Comm'r of Soc. Sec.*, No. 1:13CV794, 2015 WL 1020211, at *4 (S.D. Ohio Mar. 9, 2015) (unpublished) (finding that where the child was a "school age child" when the application was filed, but had progressed to the "adolescent" age category by the date of the evidentiary hearing, the ALJ "appropriately reviewed what a child in each of the two age categories should be able to demonstrate in the domain of acquiring and using information.").

11

A claimant's age is "an important factor" in determining functional equivalence. 20 C.F.R. § 416.924b(a). When evaluating the effects of a claimant's impairment(s) on functioning, the ALJ must consider, among other things, "[h]ow [the claimant's] functioning compares to the functioning of children [the claimant's] age who do not have impairments[.]" *Id.* § 416.924a(b)(3); *Lawson ex rel. D.D.L. v. Astrue*, No. 4:08CV282HEA, 2009 WL 2143754, at *8 (E.D. Mo. July 13, 2009) (unpublished). Specifically with respect to the domain of acquiring and using information, the regulations provide different benchmarks for what a child should be able to do based on his age category: preschool children should be "[u]sing words to ask questions, give answers, follow directions, describe things, explain what you mean, and tell stories," 20 C.F.R. § 416.926a(g)(2)(iii), and school-age children "should be able to learn to read, write, and do math, and discuss history and science" and "should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [their] own ideas, and by understanding and responding to the opinions of others," *id.* § 416.926a(g)(2)(iv). Although the ALJ cited evidence from Claimant's kindergarten and first grade teachers in her analysis (R. 20), it is far from clear whether she considered this evidence in light of the appropriate functioning of a school-age child listed in 20 C.F.R. § 416.926a(g)(2)(iv). Therefore, the ALJ's error may have materially affected the analysis and, thus, requires remand.

Additionally, portions of the ALJ's analysis are not well-supported. For example, the ALJ acknowledged that in November 2011, Claimant's first grade teacher completed a Social Security Administration questionnaire indicating Claimant had a "very serious problem" reading and comprehending written materials, expressing ideas in written form, and applying problem solving skills in class discussions, a "serious problem" in providing organized oral explanations and

adequate descriptions, and an "obvious problem" in most other areas, which included understanding school and content vocabulary, comprehending and doing math problems, understanding and participating in class discussions, learning new material, and recalling and applying previously learned material. (R. 20, 230). The ALJ then wrote, "[o]n the other hand, her only written comment was that the child had a problem trying to express and retell verbal information; that he used short, 'chopped' expressions which is consistent with the child's expressive language disorder." (R. 20). The ALJ appears to discount the teacher's ratings based on her comment, but it is unclear why, where the comment simply provides further detail in support of the ratings indicated on the form. (R. 230). The teacher's comment is highly relevant to the domain of acquiring and using information, where the regulation provides that school-age children "should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [their] own ideas, and by understanding and responding to the opinions of others." 20 C.F.R. § 416.926a(g)(2)(iv); *see* S.S.R. 09-3p, 2009 WL 396025, at *6 (Feb. 17, 2009) (listing examples of limitations considered in domain of acquiring and using information, including "[t]alks only in short, simple sentences" and "[h]as difficulty explaining things."). Moreover, the fact that the ALJ found Claimant's noted difficulties in expressing and retelling verbal information and use of "short chopped expressions" to be consistent with Claimant's expressive language disorder would corroborate the teacher's observations. (R. 20, 230). Curiously, the ALJ also cites this same evaluation favorably in another portion of her decision when analyzing Claimant's ability to interact and relate with others.[1] (R. 22) ("However, his

---

[1] There is some commonality in the considerations related to the domains of acquiring and using information and interacting and relating with others. *See* 20 C.F.R. § 416.926a(g)(1), (i)(1). Both domains take into consideration a
(continued...)

first-grade teacher reported in November 2011, that the child demonstrated 'very serious' problems in reading, writing and solving problems, and several 'obvious' problems in other activities within this domain since August 2011) (citing Exhibit 9E: 2). Accordingly, the ALJ's discussion of this evidence only creates more confusion as to whether she applied the correct standards in considering Claimant's ability to acquire and use information.

The ALJ also relied on Claimant's good performance in kindergarten, where his teacher reported no problems in this domain between August 2010 and May 2011 and he earned 3's and 4's on his kindergarten report card. (R. 20, 192-93, 240). However, this does not amount to substantial evidence upon which to sustain the ALJ's decision where the record demonstrates, and the ALJ recognized, Claimant's function deteriorated as he progressed in school. Plaintiff testified that Claimant's problems were worsening as he got older, particularly since he started second grade in August 2012. (R. 49-50, 53). The ALJ in her decision appears to agree. In finding Claimant to have a marked limitation in interacting and relating with others, the ALJ concluded "the medical record reflects these ratings correspond to the pronounced deterioration in [Claimant's] functioning as his language disorder manifested itself." (R. 22) (citations omitted). The "ratings" to which the ALJ refers are the ratings from the questionnaire filled out by Claimant's second grade teacher regarding his ability to acquire and use information. (R. 22) (citing Exhibit 9E: 2). Accordingly, where the ALJ recognized that Claimant's function was worsening over time due to the emergence of his language disorder, the Claimant's good performance in kindergarten does not provide

---

[1](...continued)
claimant's ability to express thoughts and ideas verbally. *Id.* This is particularly relevant in Claimant's case, where his therapist testified at length about how Claimant's receptive-expressive language disorder, which makes it difficult for Claimant to comprehend and express himself, is a substantial cause of his behavioral problems (R. 69-73), and explains why the ALJ discussed evidence specifically related to the domain of acquiring and using information when considering the domain of interacting and relating with others (R. 22).

14

substantial evidence to support the ALJ's decision.

Finally, the ALJ failed to sufficiently explain the weight assigned to two state agency reviewers who opined that Claimant had marked limitations in acquiring and using information. On May 20, 2011, in review of Claimant's initial application, Angela Brown, M.Ed., CCC-SLP, a speech language pathologist, opined that Claimant had a marked limitation in acquiring and using information. (R. 81-82). Brown acknowledged Claimant's kindergarten teacher's assessment indicating no significant concerns in the domain of acquiring and using information (R. 81, 192-93), but assigned controlling weight to the speech-language and functional evidence in the file, which indicated Claimant exhibited "a severe language deficit which affects his ability to comprehend and express information successfully" and that "[]his language deficits can affect his acquisition of grade level concepts." (R. 81, 190-91). On December 5, 2011, in review of Claimant's application on reconsideration, Kim L. Bigelow, M.A., CCC-CLP, a speech language pathologist, also opined that Claimant had marked limitation in acquiring and using information. (R. 93, 95). The ALJ cited the state agency reviewer's conclusions with respect to each domain and then stated as follows: "For the reasons set forth below, the undersigned finds the child experiences 'less than marked' limitations in the domain of Acquiring & Using Information and 'marked' limitations in the domain of Interacting & Relating with Others, and gives partial weight to the opinions of the second group of State Agency consultants." (R. 19).

The regulations provide that "unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency . . . medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R.

15

§ 404.1527(e)(2)(ii). The ALJ provided no substantive discussion of the favorable findings of the agency reviewers with respect to Claimant's ability to acquire and use information (R. 18-20), and it is not otherwise apparent why the ALJ discounted these opinions. Accordingly, the ALJ erred in evaluating the state agency speech pathologists' opinions that were favorable to Claimant by failing to sufficiently explain her reasons for rejecting those opinions.

In sum, the ALJ failed to apply the appropriate age category in assessing the domain of acquiring and using information, failed to cite substantial evidence in support of her determination that Claimant has a less than marked limitation in this domain, and failed to properly explain the weight given to determinations of the state agency experts that Claimant has a marked limitation in using and acquiring information. The Fourth Circuit has made clear that it is not the role of the court to remedy such failures by engaging in the required analysis in the first instance. *See Fox v. Colvin*, No. 14-2237, 2015 WL 9204287, at *5 (4th Cir. Dec. 17, 2015) (unpublished) (per curiam) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."); *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) (citing *Hancock v. Astrue*, 667 F.3d 472 (4th Cir. 2012)). Therefore, it is recommended that the matter be remanded for further proceedings.

### B.     The Administrative Hearing

Plaintiff contends the ALJ did not provide Claimant with a "full and fair hearing," specifically because the ALJ failed to ask questions relevant to the domain of acquiring and using information. Pl.'s Mem. [DE-21] at 18-21. In response, Defendant contends the ALJ fully and properly developed the record in order to allow the ALJ to make all necessary determinations. Def.'s

Mem. [DE-23] at 17-20. "Claimants in disability cases are entitled to a full and fair hearing of their claims, 20 C.F.R. 404.927 and 416.1441, and the failure to have such a hearing may constitute good cause sufficient to remand to the Secretary under 42 U.S.C. § 405(g) for the taking of additional evidence." *Kearney v. Astrue*, 730 F. Supp. 2d 482, 484 (E.D.N.C. 2010) (quoting *Sims v. Harris*, 631 F.2d 26, 27 (4th Cir. 1980)). "[W]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded." *Id.* (quoting *Marsh v. Harris*, 632 F.2d 296 (4th Cir. 1980)). "[T]he ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Id.* (quoting *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). When a "claimant is unrepresented by counsel at a hearing before an ALJ, the claimant is entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to [a] heightened duty of care and responsibility." *Smith v. Barnhart*, 395 F. Supp. 2d 298, 301 (E.D.N.C. 2005) (internal quotation marks and citations omitted).

Plaintiff suggests several questions the ALJ should have asked in order to afford Claimant with a full and fair hearing, such as how well Claimant read or wrote, if he had difficulty remembering what was learned in school the day before, if he used language appropriate for his age, if he was reading, writing, or doing arithmetic at the appropriate grade level, if he had difficulties comprehending written or oral directions or following simple instructions, if he talked only in short, simple sentences, or if he had difficulty explaining things. Pl.'s Mot. [DE-21] at 20-21; Pl.'s Resp. [DE-25] at 7-8. These questions are taken from a list in S.S.R. 09-3p of examples of limitations considered in assessing the domain of acquiring and using information. 2009 WL 396025, at *6.

A review of the hearing transcript indicates that Plaintiff or Bowman testified regarding many of these issues (R. 45, 47-50, 53-60, 65-73) and, as Plaintiff concedes, the ALJ is not required to ask about every limitation listed in S.S.R. 09-3p. Accordingly, Plaintiff's contention that Claimant did not receive a full and fair hearing because the record was not fully developed on the issue of Claimant's ability to acquire and use information is without merit.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings [DE-20] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-22] be DENIED, and the matter be remanded for further proceedings.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **March 10, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **10 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding**

district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

SUBMITTED, the 25th day of February 2016.

Robert B. Jones, Jr.
United States Magistrate Judge